FILED _____ ENTERED
_____ LODGED _____ RECEIVED

FEB 14 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No.  MJ20- 068
Target Residences 1 & 2 and Target Vehicle 1, more )
fully described in Attachments A1-A3 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Target Residences 1 & 2 and Target Vehicle 1, more fully described in Attachments A1-A3

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C §§ 841(a)(1) & 846 | Possession and Distribution of Controlled Substances |

The application is based on these facts:

✓ See Affidavit of Special Agent Eric Rodenberg, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*SA E—* _____
Applicant's signature

Eric Rodenberg, DEA Special Agent
Printed name and title

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:    February 14, 2020                _____
Judge's signature

City and state:  Seattle, Washington         Mary Alice Theiler, United States Magistrate Judge
Printed name and title

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| | )   ss |
| COUNTY OF KING | ) |

## AFFIDAVIT

I, Eric Rodenberg, a Special Agent with the Drug Enforcement Administration, United States Department of Justice, being first duly sworn on oath, depose and state as follows:

## AFFIANT BACKGROUND

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have been so employed since August 2019.  I am currently assigned to the DEA Seattle Field Division, Tacoma Resident Office.

3.      I received 16 weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from August 2019 to December 2019.  The training curriculum covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigations, and the general operation of drug trafficking organizations.

4.      While working as a Special Agent, I have been involved in the investigation of individuals and organizations involved in the manufacture, transportation and distribution of controlled substances.  I have participated in the execution of search warrants for violations of federal and state drug laws.  I have conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacture, transportation and distribution of controlled substances.  I have also consulted with other Special Agents that have monitored informant conversations with

AFFIDAVIT OF SA ERIC RODENBERG – 1
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  drug traffickers, and have monitored drug-related conversations between drug traffickers
2  as part of court-authorized interception of wire communications.  In light of the
3  foregoing, I am familiar with the manner in which illegal drugs are manufactured,
4  transported, stored, and distributed; the methods of payment for such drugs; and the
5  methods of laundering of drug proceeds.

6        5.      Prior to working for the DEA, I was employed with the Kent Police
7  Department in Kent, Washington.  I was assigned to the patrol division from June 2018 to
8  August 2019.  While working at Kent PD, I came in contact with individuals using and
9  selling drugs on a daily basis.  I became familiar with the different tactics used to conceal
10  drugs as well as the different methods used to transport and speak about drugs.

11        6.      Prior to working with the Kent Police Department, I was employed with the
12  Missouri State Highway Patrol ("MSHP") from July 2013 to May 2018.  While working
13  with the MSHP I received over 1,400 hours of specialized law enforcement training at the
14  MSHP training academy.  The curriculum covered subjects such as investigative skills,
15  interview and interrogation techniques, enforcement of various laws, building searches,
16  firearms marksmanship, and physical training.  Following the academy, I enrolled in the
17  Drug Recognition Expert ("DRE") program, and was trained to identify drugs and the
18  physical symptoms associated with their use.

19                              **PURPOSE OF AFFIDAVIT**

20        7.      This affidavit is submitted in support of an application pursuant to Federal
21  Rule of Criminal Procedure 41 for a search warrant to search the following locations and
22  conveyance:

23              a.  **Target Residence 1**: 9053 3rd Avenue South, Seattle, Washington,
24        as more fully set forth in Attachment A-1, which is incorporated herein by reference.

25              b.  **Target Residence 2**: 453 Southwest 154th Street, Apartment #305,
26        Burien, Washington, as more fully set forth in Attachment A-2, which is incorporated
27        herein by reference.

28

AFFIDAVIT OF SA ERIC RODENBERG – 2
USAO #2020R00153

1           c. **Target Vehicle 1**: a blue 1998 Mazda B4000 pickup truck, bearing

2    Washington license plate C80981M, as more fully set forth in Attachment A-3, which

3    is incorporated herein by reference.

4        8.    As set forth below, I submit that there is probable cause to believe that the

5    aforementioned locations and conveyance will contain or possess evidence, fruits, and

6    instrumentalities of violations of Tittle 21, United States Code, Sections 841 and 846

7    distribution and possession with intent to distribute controlled substances, and conspiracy

8    to commit these offenses).  I seek authorization to search and seize items specified in

9    Attachment B, which is incorporated herein by reference.

10        9.    The facts set forth in this Affidavit are based on my own personal

11    knowledge; knowledge obtained from other individuals during my participation in this

12    investigation, including other law enforcement officers; review of documents and records

13    related to this investigation; communications with others who have personal knowledge

14    of the events and circumstances described herein; and information gained through my

15    training and experience.  Because this Affidavit is submitted for the limited purpose of

16    establishing probable cause in support of the application for a search warrant, it does not

17    set forth each and every fact that I or others have learned during the course of this

18    investigation.  When the statements of others are set forth in this affidavit, they are set

19    forth in substance and in part.

20              **<u>SOURCES OF INFORMATION</u>**

21        10.    During the course of this investigation, agents have received information

22    from a confidential source ("CS"), as set forth below.

23        11.    The CS has been providing information and assistance to the DEA since

24    2015.  The CS has a criminal history consisting of one felony burglary conviction from

25    2012, and two felony drug trafficking arrests (2006 and 2008), where no charges were

26    filed.  The CS is currently providing information and assistance to the DEA in exchange

27    for monetary compensation and immigration benefits.

28

AFFIDAVIT OF SA ERIC RODENBERG – 3
USAO #2020R00153

1    12.    Since 2015, the CS has provided reliable information and assistance to the

2    DEA in numerous drug trafficking investigations.  The CS has conducted more than 20

3    controlled drug purchases and provided information that was proven reliable and led to

4    the arrest and convictions of numerous drug traffickers.  The CS is familiar with the

5    appearance of methamphetamine, cocaine, and heroin, and the way they are packaged,

6    transported and sold.

7                          **PROBABLE CAUSE**

8    13.    Agents of the DEA Tacoma Resident Office ("DEA TRO") are conducting

9    a drug-trafficking investigation.  Julian GUTIERREZ-PONCE and Juan Jose VEGA-

10   FLORES have been identified as traffickers of methamphetamine and suspected fentanyl

11   pills.  The following paragraphs describe the identification of GUTIERREZ-PONCE and

12   VEGA-FLORES and their respective residences, as well as controlled purchases

13   conducted during this investigation.

14   **A. Controlled Purchase of Methamphetamine in November 2019**

15   14.    On November 1, 2019,[1] the CS reported to DEA TRO agents that s/he was

16   communicating telephonically with an unidentified male ("UM1"), who was using a

17   Mexican telephone number.  The CS reported that UM1 is a methamphetamine trafficker

18   who was offering to sell multi-kilogram quantities of methamphetamine to the CS in

19   the Seattle, Washington area.

20   15.    On the same date, at the direction of Special Agent ("SA") Jared Gibb, the

21   CS attempted to call UM1 several times, but the calls were unanswered.  A short time

22   later, the CS received a call from a second unidentified male ("UM2").  SA Gibb, who is

23   fluent in Spanish, monitored and recorded the call.[2]  During the call, the CS spoke in

24

25

26   ───────────────

27   [1] Unless otherwise noted, all dates and times described herein are approximate.

28   [2] All of the recorded telephone calls and text messages referenced in this Affidavit occurred in Spanish
     and were reviewed and translated by SA Gibb.

AFFIDAVIT OF SA ERIC RODENBERG – 4
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Spanish with UM2 and arranged to meet UM2 the following week in the Seattle/Tacoma

2  area to get a sample of methamphetamine.

3       16.    On November 4, 2019, at 12:13 p.m., at the direction of agents, the CS

4  called UM2 to arrange the "sample meeting." The call was not answered. At 12:39 p.m.,

5  the CS received an incoming call from UM2. During the call, which SA Gibb monitored

6  and recorded, the CS spoke with UM2 and arranged to meet UM2 at the Tacoma Mall,

7  located at 4502 S. Steele Street, Tacoma, Washington. UM2 agreed to bring a sample of

8  methamphetamine to the CS at that location. At 1:20 p.m., agents established

9  surveillance in the parking lot of the Tacoma Mall.

10       17.    At 1:32 p.m., SA Gibb and Task Force Officer ("TFO") Robert Shaw met

11  with the CS at a predetermined location near the Tacoma Mall. SA Gibb and TFO

12  Shaw searched the CS's person and vehicle for contraband, with none found. SA Gibb

13  outfitted the CS with an audio/video recording/transmitting device. At 1:36 p.m., the CS

14  placed a monitored/recorded call to UM2. During the call, the CS and UM2 confirmed

15  that they would meet in about 10 minutes at the Tacoma Mall.

16       18.    At 1:43 p.m., at the direction of SA Gibb and TFO Shaw, the CS drove to

17  and parked in the parking lot of the Tacoma Mall. Constant surveillance was maintained

18  on the CS during the operation. At 1:53 p.m., the CS placed a call to UM2 that SA Gibb

19  monitored and recorded. During the call, the CS told UM2 that s/he had arrived. UM2

20  said that he was inside the mall and would come out to meet the CS.

21       19.    At 1:55 p.m., TFO Shaw observed a Hispanic male, who was later

22  identified as GUTIERREZ-PONCE, walk from the entrance of the Tacoma Mall toward

23  the CS's vehicle. TFO Shaw observed that GUTIERREZ-PONCE was carrying a

24  motorcycle helmet. TFO Shaw and SA Gibb observed the CS exit his/her vehicle, and

25  greet GUTIERREZ-PONCE. SA Gibb and TFO Shaw took surveillance photographs of

26  GUTIERREZ-PONCE at that time. Both the CS and GUTIERREZ-PONCE then entered

27  the CS's vehicle.

28

AFFIDAVIT OF SA ERIC RODENBERG – 5
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20.     When they entered the vehicle, SA Gibb—who monitored the meeting via a monitoring/recording device—heard the CS and GUTIERREZ-PONCE discussing the quality of methamphetamine.  As instructed by agents prior to the meeting, the CS told GUTIERREZ-PONCE that s/he may be interested in purchasing a pound or more of methamphetamine from GUTIERREZ-PONCE later that day.  GUTIERREZ-PONCE told the CS that he had other business to do in Tacoma, and if the CS wanted to purchase methamphetamine, he (GUTIERREZ-PONCE) could meet the CS in Federal Way later that day.  GUTIERREZ-PONCE mentioned that he could call an associate to bring the methamphetamine to Federal Way for the transaction.

21.     At 2:00 p.m., TFO Shaw and SA Gibb observed GUTIERREZ-PONCE exit the CS's vehicle and walk toward a motorcycle that was parked in the mall parking lot. TFO Justin Chohrach observed the license plate of the motorcycle:  Washington 9F2142, which is registered to Julian GUTIERREZ-PONCE at 9053 3rd Avenue S., Seattle, Washington (**Target Residence 1**).  At 2:02 p.m., TFO Shaw observed GUTIERREZ-PONCE depart the mall parking lot on the motorcycle.  Surveillance was maintained on the GUTIERREZ-PONCE.

22.     Following the meeting between the CS and GUTIERREZ-PONCE, SA Gibb and Group Supervisor ("GS") Lance Lehnhoff maintained surveillance on the CS and met the CS at a predetermined location.  SA Gibb recovered the recording device from the CS, and the CS handed SA Gibb a clear zip-lock bag that was tied in a knot and contained a small amount of a suspected methamphetamine.  SA Gibb and GS Lehnhoff searched the CS's person and vehicle for contraband, with none found. Agents preserved the small amount of methamphetamine as evidence, but did not conduct a field test of the substance due to the small amount.

23.     SA Gibb and GS Lehnhoff then interviewed the CS briefly.  The CS stated that GUTIERREZ-PONCE had provided the methamphetamine to the CS after GUTIERREZ-PONCE entered the CS's car.  The CS stated that GUTIERREZ-PONCE

AFFIDAVIT OF SA ERIC RODENBERG – 6
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  had two cell phones, and had provided a phone number to contact him in the future: 424-
2  370-9214.

3      24.    Meanwhile, agents continued surveillance of GUTIERREZ-PONCE, who
4  traveled north on Interstate 5, then west on Highway 16, before exiting at Union Avenue.
5  Surveillance of GUTIERREZ-PONCE was briefly lost in the area of S. Tyler Street and
6  S. 34th Street in Tacoma, where GUTIERREZ-PONCE conducted several counter-
7  surveillance maneuvers (for example, u-turns and quick direction changes) and
8  eventually traveled to a dead-end street at Jane Russells Way.  At 2:27 p.m., TFO
9  Chohrach observed GUTIERREZ-PONCE exit the dead-end street and depart the area.

10     25.    At 2:25 p.m., (just prior to GUTIERREZ-PONCE leaving the area of Jane
11 Russells Way) the CS received a text message (while in the presence of SA Gibb and GS
12 Lehnhoff) from the telephone number that GUTIERREZ-PONCE provided to the CS
13 during the meeting: 424-370-9214.  The message read, "I'm going up there let me know
14 buddy."  The CS immediately placed two outgoing calls to 424-370-9214, which both
15 went unanswered.

16     26.    Surveillance was maintained on GUTIERREZ-PONCE as he traveled north
17 on S. Union Avenue, where he pulled over to the side of the road and parked in an alley.
18 Agents observed that GUTIERREZ-PONCE appeared to be watching traffic and talking
19 via a bluetooth device on his motorcycle helmet.

20     27.    At 2:31 p.m., the CS received an incoming call from 424-370-9214, which
21 SA Gibb monitored and recorded.  SA Gibb listened to the call via speakerphone, and
22 heard the CS talking in Spanish with GUTIERREZ-PONCE.  During the call, the CS and
23 GUTIERREZ-PONCE agreed to meet in Federal Way.  GUTIERREZ-PONCE said that
24 he would go to Federal Way, and that he would call his friend.  The CS then asked
25 GUTIERREZ-PONCE about the price for methamphetamine.  GUTIERREZ-PONCE
26 stated that he understood that the price had already been agreed upon.  The CS told
27 GUTIERREZ-PONCE, "twenty-one," and GUTIERREZ-PONCE replied "yes."

28

AFFIDAVIT OF SA ERIC RODENBERG – 7
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.     At 2:34 p.m., GUTIERREZ-PONCE called the CS back from 424-370-9214. SA Gibb monitored and recorded the call.  During the call, GUTIERREZ-PONCE asked the CS how many "hours" the CS wanted.  Based upon my training and experience, I know that, in this context, "hours" refers to pounds of methamphetamine.  The CS replied that s/he just wanted one.  GUTIERREZ-PONCE told the CS that he would "let the guy know," and that "they are leaving right now."

29.     At 2:36 p.m., TFO Chohrach observed GUTIERREZ-PONCE drive out of the alley.  Surveillance was maintained on GUTIERREZ-PONCE as he traveled north on Interstate 5 and exited at S. 320th Street, where he traveled west and entered the parking lot of the Commons shopping mall, located at 1928 S. Commons, Federal Way, Washington.  Agents maintained intermittent surveillance of GUTIERREZ-PONCE as he drove around the mall parking lot.  During this surveillance, agents became concerned that GUTIERREZ-PONCE had detected surveillance units.

30.     At 2:50 p.m., SA Gibb and GS Lehnhoff met with the CS at a predetermined location near the Commons shopping mall.  SA Gibb and  GS Lehnhoff again searched the CS's person and vehicle for contraband, with none found.  SA Gibb outfitted the CS with an audio/video recording/transmitting device.  SA Gibb provided the CS with $2,100 in pre-recorded Task Force buy funds.

31.     At 2:55 p.m., SA Scott Modesitt observed GUTIERREZ-PONCE exit the mall parking lot traveling east on S. 320th Street.  After GUTIERREZ-PONCE entered an adjacent parking lot and immediately looped around to exit, surveillance was terminated due to concern that GUTIERREZ-PONCE had detected surveillance.

32.     At 3:06 p.m., at the direction of SA Gibb and GS Lehnhoff, the CS drove to and parked in the parking lot of the Commons shopping mall.  Constant surveillance was maintained on the CS during the operation.  The CS parked in a parking spot on the north end of the parking lot.

33.     At 3:14 and 3:16 p.m., the CS called placed outgoing calls to 424-370-9214.  Both calls went unanswered.  At 3:18 p.m., the CS sent GUTIERREZ-PONCE a

AFFIDAVIT OF SA ERIC RODENBERG – 8
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   text message (to 424-370-9214).  The message read, "What's up listen now I'm here

2   where we agreed."  At 3:19 p.m., the CS received a text message from GUTIERREZ-

3   PONCE that read, "Ok give me a chance now almost."  The CS replied at 3:19 p.m., "Ok

4   don't take too long please because I have other things to do and now you can see the

5   fucking traffic."  At 3:21 p.m., GUTIERREZ-PONCE (424-370-9214) replied, "Yes I'll

6   see you right away buddy."

7           34.     At 3:29 p.m., the CS received a call from GUTIERREZ-PONCE (424-370-

8   9214), which SA Gibb remotely monitored and recorded.  During the call, GUTIERREZ-

9   PONCE made statements indicating that he was concerned that he was being followed

10   and therefore wanted to change the meeting location.  GUTIERREZ-PONCE told the CS

11   to follow him when GUTIERREZ-PONCE arrived.  GUTIERREZ-PONCE told the CS

12   that he had seen some trucks that he did not like, and he asked if the CS had seen

13   them.  The CS told GUTIERREZ-PONCE where s/he was parked.  After this call, SA

14   Gibb instructed the CS to move to a parking spot on the east end of the parking lot.

15           35.     At 3:36 p.m., TFO William Earick observed GUTIERREZ-PONCE enter

16   the shopping mall parking lot on the motorcycle.  Surveillance was maintained on

17   GUTIERREZ-PONCE, who drove around the parking lot for several minutes, then

18   parked in north end of the parking lot, and was observed talking on a cell phone by TFO

19   Earick.

20           36.     At 3:37 p.m., the CS sent a text message to GUTIERREZ-PONCE (424-

21   370-9214) which read, "Send me the location where you want me to see you I left to take

22   a turn to see what I can see."  At 3:40 p.m., the CS received a call from GUTIERREZ-

23   PONCE (424-370-9214), which SA Gibb remotely monitored and recorded.  During the

24   call, the CS told GUTIERREZ-PONCE where s/he had moved to in the parking lot.

25           37.     At 3:41 p.m., TFO Earick observed GUTIERREZ-PONCE drive east

26   through the parking lot and park near the CS.  GS Lehnhoff observed the CS talking to

27   GUTIERREZ-PONCE, who remained seated on his motorcycle.  At 3:44 p.m., GS

28   Lehnhoff observed GUTIERREZ-PONCE put on his helmet and drive out of the parking

AFFIDAVIT OF SA ERIC RODENBERG – 9
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  lot. The CS then entered his/her vehicle. The CS then informed SA Gibb that

2  GUTIERREZ-PONCE had told him/her to meet across the street at the Harbor Freight

3  Tools store at 31858 Pacific Highway S., Federal Way, Washington. Surveillance was

4  subsequently established at that location.

5       38.    At the direction of agents, the CS drove directly to the Harbor Freight

6  location and parked in the parking lot. At 3:57 p.m., SA Gibb observed GUTIERREZ-

7  PONCE on the motorcycle, which was parked in the southwest corner of the parking lot.

8  SA Gibb observed that GUTIERREZ-PONCE was overlooking the parking lot.

9       39.    At 3:59 p.m., the CS called GUTIERREZ-PONCE (424-370-9214). SA

10  Gibb remotely monitored and recorded the call. During the call, GUTIERREZ-PONCE

11  said he was in the corner of the parking lot. The CS responded that s/he was down

12  below. GUTIERREZ-PONCE told the CS that he would tell the guy where the CS was

13  located.

14       40.    At 4:01 p.m., SA Gibb (via the recording/monitoring equipment) heard the

15  CS enter a vehicle and speak in Spanish with a male. At that time, GS Lehnhoff, who

16  had primary visual surveillance on the CS's vehicle, had his view blocked by traffic and

17  did not see the CS exit his/her vehicle, and could not tell what vehicle the CS had

18  entered.

19       41.    SA Gibb heard (via the recording/monitoring equipment) that the CS and

20  the male were conducting a drug transaction. Specifically, SA Gibb heard the male ask

21  the CS, "How much is it?" The CS answered "21." The CS then asked, "Is it weighed

22  right?" and the male answered, "Yes." At that time, GS Lehnhoff observed a small white

23  hatchback parked near the CS's vehicle. About one minute later, SA Gibb observed

24  GUTIERREZ-PONCE drive the motorcycle towards where the CS was parked. SA

25  Modesitt observed GUTIERREZ-PONCE continue through the parking lot and exit

26  westbound on S. 320th Street.

27       42.    At 4:03 p.m., SA Gibb heard the CS exiting the vehicle. At 4:03 p.m., GS

28  Lehnhoff observed the white hatchback backing up and departing the area. Agents

AFFIDAVIT OF SA ERIC RODENBERG – 10
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  attempted to follow the hatchback but were unable to locate it due to heavy traffic on
2  Pacific Highway S.

3      43.    Following the meeting between the CS and the male in the white
4  hatchback, SA Gibb, TFO Shaw, and TFO Sean Scott maintained surveillance on the CS
5  and met the CS at a predetermined location. SA Gibb recovered the recording device
6  from the CS, and the CS handed SA Gibb a white plastic bag that contained a clear
7  plastic heat-seal bag, which contained approximately one pound of suspected
8  methamphetamine. SA Gibb and TFO Shaw searched the CS's person and vehicle for
9  contraband, with none found. A field test of the suspected methamphetamine resulted
10  presumptive positive for methamphetamine.

11      44.    SA Gibb and TFO Shaw then interviewed the CS briefly. The CS stated
12  that when s/he parked in the Harbor Freight parking lot, s/he called GUTIERREZ-
13  PONCE and told him where s/he had parked. GUTIERREZ-PONCE stated words to the
14  effect that his associate would come over to the CS. The CS then saw the white
15  hatchback park near the CS. The male driver of the hatchback motioned to the CS to
16  enter the hatchback, at which time the CS exited his/her vehicle and entered the
17  hatchback. The CS observed that the driver was a heavyset Hispanic male. The
18  CS noticed that there were a lot of personal items on the floorboard of the hatchback as
19  s/he entered. The male mentioned that it was his "girl's" car. As the CS entered, the
20  male had the white bag containing methamphetamine in his lap, which he handed to the
21  CS. The CS opened the bag and looked at the methamphetamine, then handed the male
22  $2,100 of Task Force official funds. The male counted the money, then told the CS that
23  everything was good. The CS then exited the hatchback, which drove away.

24      45.    On November 5, 2019, SA Gibb reviewed the audio/video recordings and
25  surveillance photographs from the sample meeting and the controlled purchase the
26  previous day. SA Gibb also obtained a Washington Department of Licensing
27  ("DOL") photograph of GUTIERREZ-PONCE, based on the registered owner
28  information associated with the license plate of the motorcycle. SA Gibb observed that

AFFIDAVIT OF SA ERIC RODENBERG – 11
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the person in the DOL photograph was the same person (GUTIERREZ-PONCE) as the

2   person in the surveillance photographs and video recording that the CS met at the

3   Tacoma mall.  On the same date, SA Gibb showed the DOL photograph to the CS, who

4   positively identified GUTIERREZ-PONCE as the person who provided the

5   methamphetamine sample and arranged for the delivery of the one pound of

6   methamphetamine.

7          46.     Additionally, on November 5, 2019, SA Gibb reviewed the audio/video

8   recording of the controlled purchase of one pound of methamphetamine that the CS

9   conducted with the heavy-set Hispanic male at the Harbor Freight parking lot.  SA Gibb

10  observed that the video recording did not capture a full view of the male's face.  SA Gibb

11  observed that the video briefly captured part of the male's face, including his hairline and

12  right eye.  SA Gibb recognized this image as similar to that of a suspect in another drug

13  trafficking investigation, Juan Jose VEGA-FLORES.  On the same date, SA Gibb

14  obtained a Washington DOL photograph of VEGA-FLORES and showed it to the CS,

15  who positively identified VEGA-FLORES as the male who sold him/her one pound of

16  methamphetamine at the Harbor Freight parking lot the previous day.

17         47.     Following this first controlled purchase, a DEA analyst performed

18  telephone toll analysis for 424-370-9214, the phone used by GUTIERREZ-PONCE to

19  arrange the transaction with the CS.  Telephone toll analysis was completed in order to

20  identify a phone that VEGA-FLORES used to communicate with GUTIERREZ-PONCE.

21  Agents believe that GUTIERREZ-PONCE contacted VEGA-FLORES by phone to

22  arrange for him to deliver the methamphetamine to the CS, because:  (1) GUTIERREZ-

23  PONCE told the CS that he would call his friend to deliver the methamphetamine to

24  Federal Way, and (2) agents did not observe GUTIERREZ-PONCE meet with VEGA-

25  FLORES in person before the transaction.  Knowing the time frame of the controlled

26  purchase, the analyst was able to determine that 206-227-2871 is the phone most likely

27  used by VEGA-FLORES to communicate with GUTIERREZ-PONCE to coordinate the

28  delivery of methamphetamine.  A search of law enforcement databases also revealed that

AFFIDAVIT OF SA ERIC RODENBERG – 12
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  206-227-2871 was identified in another DEA investigation as being a phone that is

2  utilized by VEGA-FLORES.

3  **B. Identification of the Residences of GUTIERREZ-PONCE and VEGA-**

4  **FLORES**

5  48.    On November 8, 2019, Pierce County Superior Court Judge Grant Blinn

6  signed an order authorizing real-time GPS location information for the telephone used by

7  GUTIERREZ-PONCE during the controlled purchase on November 4, 2019: 424-370-

8  9214. Agents served the order on the telephone provider on the same date and began to

9  receive location data for the telephone.  Location data for the device showed that it was

10  located overnight throughout the month of November 2019 at an address (**Target**

11  **Residence 1**), which coincides with a motorcycle registered to GUTIERREZ-PONCE at

12  that address.

13  49.    On November 18, 2019, agents received information from the Port of

14  Seattle Police Department ("PSPD") regarding VEGA-FLORES.  According to the

15  PSPD's investigation, on October 4, 2019, VEGA-FLORES was involved in a car

16  accident in the 16000 block of Air Cargo Road, in SeaTac, Washington.  VEGA-

17  FLORES had apparently rear-ended another vehicle.  Further investigation revealed that

18  VEGA-FLORES was driving a vehicle that was displaying a stolen license plate.  During

19  a search of VEGA-FLORES's vehicle, PSPD officers recovered a stolen Smith and

20  Wesson M&P 380 pistol.  Following the accident, VEGA-FLORES provided his

21  residence address to PSPD officers as 435 SW 154th Street, Apt. 305, Burien,

22  Washington (**Target Residence 2**), which matches the addresses associated with VEGA-

23  FLORES according to DOL records.

24  **C. Controlled Purchase of Methamphetamine in December 2019**

25  50.    Following the above-described controlled purchase on November 4, 2019,

26  the CS had several telephone calls with GUTIERREZ-PONCE regarding future drug

27  transactions, which occurred over the span of several weeks.  SA Gibb remotely

28  monitored and recorded the calls.  During one of the calls, GUTIERREZ-PONCE told the

AFFIDAVIT OF SA ERIC RODENBERG – 13
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  CS that GUTIERREZ-PONCE was lowering the price per pound of methamphetamine,

2  from $2,100 to $1,900.

3      51.    Additionally, on November 20, 2019, the CS received a call from

4  GUTIERREZ-PONCE, who was calling from 562-884-5338.  During the call,

5  GUTIERREZ-PONCE told the CS that 562-884-5338 was his new telephone number.

6  On December 2, 2019, Pierce County Superior Court Judge Orlando signed an order

7  authorizing real time GPS location information for 562-884-5338.  Agents served the

8  order on the telephone provider on the same date and began to receive location data for

9  the telephone on December 3, 2019.  Location data for the telephone showed that it was

10 located overnight at **Target Residence 1**, throughout the months of December 2019 and

11 January 2020.[3]

12     52.    On December 3, 2019, agents conducted another controlled purchase of

13 methamphetamine from GUTIERREZ-PONCE, utilizing the CS.  At 1:54 p.m., agents

14 established surveillance at **Target Residence 1**.  When surveillance was established,

15 TFO Earick observed a blue 1998 Mazda B4000 pickup, Washington license C80981M

16 **(Target Vehicle 1)** (registered to Vallarta's Landscaping, at **Target Residence 1).**

17     53.    At 1:55 p.m., SA Gibb and TFO Scott met with the CS at a predetermined

18 location.  SA Gibb and TFO Scott searched the CS's person and vehicle for contraband,

19 with none found.  SA Gibb outfitted the CS with an audio/video recording/transmitting

20 device.  SA Gibb provided the CS with $1,900 of DEA Official Advanced Funds

21 ("OAF") for the controlled purchase.

22     54.    At 2:03 p.m., the CS placed a monitored/recorded call to GUTIERREZ-

23 PONCE at 562-884-5338.  During the call, the CS requested (in coded language) to

24 purchase methamphetamine from GUTIERREZ-PONCE and requested to meet him in

25

26 [3] GPS location data did show that GUTIERREZ-PONCE left the State of Washington on two occasions,

27 once when he traveled to Hawaii for several days, and a second time when he traveled to Southern
California and Mexico.  GUTIERREZ-PONCE mentioned both of these trips to the CS during recorded

28 communications.

AFFIDAVIT OF SA ERIC RODENBERG – 14
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   about 30 minutes.  GUTIERREZ-PONCE agreed to the transaction but told the CS that

2   he could not meet that soon, because GUTIERREZ-PONCE was watching his child

3   and waiting for his wife to arrive.  GUTIERREZ-PONCE mentioned that his wife had go

4   to "the security."  GUTIERREZ-PONCE told the CS that he would advise the CS when

5   he would be available.  The CS told GUTIERREZ-PONCE that he needed "the same as

6   last time," meaning one pound of methamphetamine.  The CS told GUTIERREZ-PONCE

7   that he wanted large pieces or crystals of methamphetamine, as opposed to powdery,

8   smaller crystals.  GUTIERREZ-PONCE agreed.

9        55.    Meanwhile, at 1:58 p.m., TFO Chohrach established surveillance at **Target**

10   **Residence 2**, the residence of VEGA-FLORES.  At that time, TFO Chohrach observed a

11   white Ford hatchback, Washington license BNX1305 (registered to Alma P Gil Gonzalez

12   at **Target Residence 2**) parked in the parking lot of the apartment building.  This car is

13   the same make and appearance of a car driven by VEGA-FLORES on November 4, 2019

14   when he delivered the CS one pound of methamphetamine.  TFO Chohrach observed two

15   Hispanic males near the Ford hatchback.  The males were working on an SUV that was

16   also parked in the parking lot.  TFO Chohrach could not determine from his surveillance

17   position whether or not either of the males was VEGA-FLORES.

18        56.    At 2:15 p.m., the CS received an incoming call from GUTIERREZ-PONCE

19   (562-884-5338), which was monitored and recorded by agents.  During the call,

20   GUTIERREZ-PONCE told the CS that he found someone that could take care of the

21   child, so he would be able to meet the CS soon at the Southcenter Mall.

22        57.    At 2:21 p.m., TFO Earick observed a Hispanic male matching the

23   description of GUTIERREZ-PONCE walk from **Target Residence 1**, carrying a small

24   child, which he placed in the rear seat of an Acura sedan (Washington license BDV3248).

25   TFO Earick observed GUTIERREZ-PONCE enter the driver's seat of the Acura and

26   depart the area.  Surveillance was maintained on the Acura as it traveled to a Shell gas

27   station located at 9525 14th Avenue S., Seattle, and parked near the gas pumps.  GS

28

AFFIDAVIT OF SA ERIC RODENBERG – 15
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Lehnhoff observed GUTIERREZ-PONCE enter the gas station briefly then return to the

2   Acura and drive out of the area.

3          58.    Surveillance was maintained on the Acura as it traveled to the Social

4   Security Office located at 151 SW 156th Street, Burien, Washington, where it stopped in

5   the parking lot for several minutes.  TFO Ryan Hamilton observed that the Acura was

6   parked in the parking lot with the "hazard" flashers activated, but agents were not in a

7   position to see what GUTIERREZ-PONCE did while in the parking lot.

8          59.    At 2:44 p.m., TFO Hamilton observed the Acura depart the parking lot of

9   the Social Security office, traveling eastbound.  Surveillance was maintained on the

10  Acura for a short distance, at which time surveillance was lost.  Agents then moved to

11  establish surveillance at the Southcenter Mall.

12         60.    At 2:54 p.m., the CS placed a monitored/recorded call to GUTIERREZ-

13  PONCE (562-884-5338).  During the call GUTIERREZ-PONCE told the CS that he

14  would arrive in 10-15 minutes, and that GUTIERREZ-PONCE needed to make sure the

15  product was good (i.e., larger crystals as the CS requested).

16         61.    At 3:07 p.m., at the direction of SA Gibb and TFO Scott, the CS drove to

17  and parked in the parking lot of the Buffalo Wild Wings restaurant, located at the north

18  end of the Southcenter Mall, at 2800 Southcenter Mall, Seattle, Washington.  Constant

19  surveillance was maintained on the CS during the operation.

20         62.    At 3:12 p.m., the CS called with GUTIERREZ-PONCE (562-884-5338),

21  who stated that he was finishing up and would meet the CS at the Buffalo Wild Wings

22  restaurant in 10 minutes.  At 3:27 p.m., SA Gibb heard, via the transmitting device, that

23  the CS was talking on the phone with GUTIERREZ-PONCE and directing him to where

24  the CS was parked.  SA Gibb then observed **Target Vehicle 1** arrive and park next to the

25  CS's vehicle.  This is the same truck that was parked at the **Target Residence 1**

26  previously in the day, indicating that GUTIERREZ-PONCE had returned to **Target**

27  **Residence 1** after he went to the Social Security office in Burien and before meeting with

28  the CS.

AFFIDAVIT OF SA ERIC RODENBERG – 16
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      63.    SA Gibb observed GUTIERREZ-PONCE exit **Target Vehicle 1** and enter

2 the front passenger seat of the CS's vehicle, at which time SA Gibb heard (via the

3 transmitting device) GUTIERREZ-PONCE conduct a drug transaction with the CS.

4 Specifically, SA Gibb observed GUTIERREZ-PONCE hand the CS a package containing

5 a crystal substance that SA Gibb recognized, based on his training and experience, to be

6 methamphetamine.  While looking at the package, the CS commented to GUTIERREZ-

7 PONCE, "This looks better."  At 3:30 p.m., SA Gibb observed GUTIERREZ-PONCE

8 exit the CS's vehicle, enter the driver's seat of **Target Vehicle 1**, and drive out of the

9 area.  Surveillance was maintained on **Target Vehicle 1** as it traveled south on

10 Southcenter Parkway, west on S. 200th Street, and north on Military Road, at which point

11 surveillance was lost.

12      64.    TFO Earick subsequently established surveillance at **Target Residence 1**,

13 and observed that **Target Vehicle 1** had not returned to the residence.  Surveillance was

14 subsequently terminated.

15      65.    Meanwhile, SA Gibb and TFO Scott maintained constant surveillance on

16 the CS and met the CS at a predetermined location.  The CS provided agents a red gift

17 bag, which contained a clear zip lock bag that contained suspected methamphetamine.

18 Agents searched the CS's person and vehicle for contraband, with none found.  SA Gibb

19 recovered the recording device from the CS.  Agents conducted a field test of the

20 suspected methamphetamine, which returned presumptive positive for methamphetamine.

21 The methamphetamine weighed approximately one pound.

22 **D. Controlled Purchase of "M-30" Pills on January 30, 2020**

23      66.    Following the controlled purchase on December 3, 2019, the CS had

24 several telephone calls with GUTIERREZ-PONCE, which occurred over the span of

25 several weeks, regarding future drug transactions.  SA Gibb monitored and recorded the

26 calls remotely.  During these communications, GUTIERREZ-PONCE told the CS, in

27 coded language, that he had "pills" available.  The CS believed that GUTIERREZ-

28 PONCE was referring to counterfeit "M-30" pills containing fentanyl.

AFFIDAVIT OF SA ERIC RODENBERG – 17
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

67.     On January 20, 2020, GUTIERREZ-PONCE called the CS from a new telephone number:  562-618-3863.  During the call, GUTIERREZ-PONCE identified 562-618-3863 as his new telephone number and told the CS to call GUTIERREZ-PONCE for whatever s/he needed (referring to drugs).  On January 28, 2020, Pierce County Superior Court Judge Orlando signed an order authorizing real time GPS location information for 562-618-3863.  Agents served the order on the telephone provider and began to receive location data for the telephone on the same date.

68.     On January 30, 2020 at 1:20 p.m., agents began to attempt to locate GUTIERREZ-PONCE, based on GPS location data for his telephone (562-618-3863), in anticipation of a controlled purchase of fentanyl pills.  At 1:45 p.m., GPS location data showed that GUTIERREZ-PONCE's telephone was located in the vicinity of 1133 W. James Street, Kent, Washington.

69.     At 2:00 p.m., agents also established surveillance at **Target Residence 1**. At 2:04 p.m., TFO Chohrach arrived at a 7-Eleven store located at the intersection of Willis Street and Central Ave in Kent, Washington, which coincided with GPS location data for GUTIERREZ-PONCE's telephone at the time.  At that location, TFO Chohrach observed a silver Mazda sedan that was parked in the parking lot.  TFO Jonathan Pearson observed that a male matching the description of GUTIERREZ-PONCE was sitting in the front passenger seat of the Mazda, while an unidentified male was in the driver's seat.

70.     One minute later, TFO Chohrach observed the Mazda drive out of the parking lot.  Agents were unable to maintain surveillance of the Mazda when it left. Agents continued to monitor GPS location data for GUTIERREZ-PONCE's telephone, which showed that the device was moving from the Kent area, toward GUTIERREZ-PONCE's residence (**Target Residence 1**).

71.     At 2:07 p.m., SA Gibb and your Affiant met with the CS at a predetermined location.  Agents searched the CS and the CS's vehicle for contraband, with none found.  SA Gibb outfitted both the CS and your Affiant (who was acting in an undercover

AFFIDAVIT OF SA ERIC RODENBERG – 18
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  capacity and will be hereafter referred to as "UC") with audio/video

2  recording/transmitting devices.

3       72.    At 2:22 p.m., at the direction of agents, the CS placed a monitored/recorded

4  call to GUTIERREZ-PONCE (562-618-3863).  The call went to voicemail.  At 2:28 p.m.,

5  the CS received an incoming call from GUTIERREZ-PONCE (562-618-3863).  The call

6  occurred in Spanish, and was monitored and recorded by SA Gibb.  During the call, in

7  coded language, the CS asked GUTIERREZ-PONCE if he could bring the CS a sample

8  of pills.  GUTIERREZ-PONCE replied, "right now where they [the pills] are, they don't

9  arrive until like four I believe... let me see if the guy has left yet."  GUTIERREZ-PONCE

10  then confirmed that the CS wanted only "the little round ones," which the CS confirmed.

11  GUTIERREZ-PONCE then stated, "Let me see... I give some to the guys so that they are

12  in the street... let me see if they still have a few so they can give me some to bring to

13  you."  The CS and agents understood this to mean that GUTIERREZ-PONCE's fentanyl

14  pill supplier was not available until 4:00 p.m., but that he would see if he could get a

15  sample from one of his redistributors or "runners" that he had given pills to previously.

16       73.    At 2:34 p.m., the CS received an incoming call from GUTIERREZ-PONCE

17  (562-618-3863).  During the call, which was monitored and recorded, GUTIERREZ-

18  PONCE told the CS that, "it looks like the guy is there."  GUTIERREZ-PONCE then

19  stated that he was changing a headlight and after that he would "go pick them up and

20  head over there."  The CS confirmed that s/he would meet GUTIERREZ-PONCE at the

21  same place that they met last time, (i.e. the Buffalo Wild Wings restaurant at the

22  Southcenter Mall).  GUTIERREZ-PONCE stated that he would arrive in approximately

23  45 minutes.

24       74.    At 2:40 p.m., TFO Earick observed **Target Vehicle 1** driving on Des

25  Moines Memorial Drive toward **Target Residence 1**.  At 2:45 p.m., SA Gibb, who was

26  monitoring a stationary surveillance camera at GUTIERREZ-PONCE's

27  residence, observed **Target Vehicle 1** arrive and park in front of **Target**

28  **Residence 1**.  SA Gibb also observed a maroon GMC Canyon pickup arrive

AFFIDAVIT OF SA ERIC RODENBERG – 19
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  simultaneously with **Target Vehicle 1**.  The GMC Canyon parked directly behind **Target**

2  **Vehicle 1**.  SA Gibb then observed GUTIERREZ-PONCE exit **Target Vehicle 1** and

3  enter the front passenger seat of the GMC Canyon.  The GMC Canyon then departed,

4  traveling north from the residence.

5       75.    Agents were unable to maintain surveillance on the GMC Canyon, due to

6  counter-surveillance driving techniques that it performed as it left the residence.  At 2:49

7  p.m., TFO Earick observed the GMC Canyon in the vicinity of the intersection of Eighth

8  Ave. S. and S. Trenton Street.  Agents were again unable to maintain surveillance of the

9  GMC Canyon.

10       76.    At 3:03 p.m., GPS location data for GUTIERREZ-PONCE's telephone

11  showed that the device was located in the vicinity of VEGA-FLORES's residence

12  (**Target Residence 2**).  The "certainty" of the GPS location was indicated at 24 meters.

13  After receiving the GPS location data, surveillance team members departed the vicinity

14  of GUTIERREZ-PONCE's residence in an attempt to locate him at VEGA-FLORES's

15  residence.

16       77.    At 3:07 p.m., the CS received an incoming call from GUTIERREZ-PONCE

17  (562-618-3863), which SA Gibb monitored and recorded.  During the call, GUTIERREZ-

18  PONCE told the CS that he would arrive in 10-15 minutes.  At 3:16 p.m., TFO Justin

19  Chohrach arrived and established surveillance at **Target Residence 2**.  TFO Chohrach

20  did not observe the GMC Canyon in the vicinity of the apartment building, indicating that

21  GUTIERREZ-PONCE had already departed to go meet the CS.

22       78.    At 3:17 p.m., at the direction of agents, the CS and UC entered the CS's

23  vehicle and drove (while under constant surveillance) to the Buffalo Wild Wings

24  restaurant located at 2800 Southcenter Mall, Seattle, Washington.  At 3:20 p.m., TFO

25  Antony Nisco observed the GMC Canyon arrive at the restaurant and park directly next

26  to the CS's vehicle on the passenger side.  SA Gibb observed GUTIERREZ-PONCE exit

27  the driver's side of the GMC Canyon and enter the back seat of the CS's vehicle.

28

AFFIDAVIT OF SA ERIC RODENBERG – 20
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

79.     After entering the vehicle, the UC observed GUTIERREZ-PONCE hand the CS a small latex bag, with a small number of pill shaped items inside.  When GUTIERREZ-PONCE entered the vehicle, the UC could smell a strong vinegar-like odor coming from the area GUTIERREZ-PONCE was sitting, particularly when he reached forward into the front seat area to hand the CS the pills.  Based on the UC's training and experience, this is a known smell associated with heroin.

80.     At 3:21 p.m., TFO Nisco observed GUTIERREZ-PONCE exit the CS's vehicle and walk back to the GMC Canyon, where he entered the driver's seat and drove out of the parking lot.  Agents maintained surveillance of the CS and UC as they drove to a predetermined location, where the UC showed SA Gibb the pills, which were stamped "M-30."  SA Gibb and the UC searched the CS and the CS's vehicle for contraband, with none found. Agents did not conduct a field test of the pills, due to the possibility that they contain fentanyl.  Agents transferred the pills to the DEA Western Regional Laboratory for analysis and safekeeping.

81.     Agents then interviewed the CS briefly regarding the meeting.  The CS stated that a short time after s/he and the UC arrived at the parking lot, s/he observed GUTIERREZ-PONCE arrive in a maroon pickup truck.  GUTIERREZ-PONCE entered the back of the CS's vehicle, handed the CS a clear plastic bag containing six small blue pills.  The CS told GUTIERREZ-PONCE that the UC had a friend who was interested in buying pills, and that s/he and the UC would go meet the friend to show the sample, and would let GUTIERREZ-PONCE know if they wanted to buy more.  The CS stated that GUTIERREZ-PONCE indicated that he was not comfortable with the UC being present and it would be better if the CS came alone in the future.

82.     At 3:32 p.m., SA Gibb observed (via the stationary surveillance camera) the GMC Canyon arrive at **Target Residence 1** and park inside the gate in the driveway at the south side of the residence.  At 3:38 p.m., GPS location data for GUTIERREZ-PONCE's telephone (562-618-3863) showed that the device was located in the vicinity of the **Target Residence 1**.

AFFIDAVIT OF SA ERIC RODENBERG – 21
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

83.     At 3:58 p.m., at the direction of agents, the CS placed a monitored/recorded call to GUTIERREZ-PONCE (562-618-3863).  During the call, the CS asked GUTIERREZ-PONCE for "270," referring to 270 pills.  GUTIERREZ-PONCE replied the he would leave in ten minutes to "pick up" and he would meet the CS in approximately 40 minutes.  Following the call, agents provided the CS with $2,500 of OAF to purchase pills from GUTIERREZ-PONCE.

84.     At 4:01 p.m., SA Gibb observed (via the stationary surveillance camera) GUTIERREZ-PONCE and an unidentified male (hereafter "UM3") walk from **Target Residence 1** toward **Target Vehicle 1**.  SA Gibb observed GUTIERREZ-PONCE enter the driver's seat of **Target Vehicle 1**, while UM3 entered the front passenger seat. **Target Vehicle 1** then departed the residence.  At 4:14 p.m., TFO Chohrach observed **Target Vehicle 1** arrive at VEGA-FLORES's apartment building (**Target Residence 2**) and park on the north side of the building.  When **Target Vehicle 1** passed TFO Chohrach, he observed that there were two occupants in the vehicle.  **Target Vehicle 1** then parked out of TFO Chohrach's view.  A minute later, TFO Chohrach drove through the rear parking lot of apartment building and observed **Target Vehicle 1** parked up against a fence, not in a parking stall.  TFO Chohrach observed there was only a front-seat passenger in the vehicle and no one in the driver's seat.

85.     At 4:16 p.m., at the direction of agents, the CS entered his/her vehicle and drove, while under constant surveillance, back to the Buffalo Wild Wings restaurant parking lot.

86.     At 4:22 p.m., TFO Chohrach walked through the parking lot of **Target Residence 2**.  As he walked by the **Target Vehicle 1**, TFO Chohrach noted that the front-seat passenger was still the only person in the vehicle.  TFO Chohrach maintained surveillance on **Target Vehicle 1**.

87.     At 4:23 p.m., TFO Chohrach observed a white Ford Focus, bearing Washington license plate BNX1305, arrive at the apartment building and park in a parking stall in the parking lot for **Target Residence 2**.  This is the same Ford Focus that

AFFIDAVIT OF SA ERIC RODENBERG – 22
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  is associated with VEGA-FLORES (as described above).  TFO Chohrach observed three

2  children exit the passenger side of the Ford Focus, while another male remained seated in

3  the driver's seat.  TFO Chohrach observed that the three subjects that exited the Ford

4  Focus all walked up the stairs on the south side of the apartment building and entered

5  **Target Residence 2**.

6      88.    At 4:26 p.m., TFO Chohrach observed GUTIERREZ-PONCE exit **Target**

7  **Residence 2** and walk down the stairs.  TFO Chohrach observed that GUTIERREZ-

8  PONCE was talking on a cell phone, and entered the driver's seat of **Target Vehicle 1**.

9  While GUTIERREZ-PONCE was still sitting in **Target Vehicle 1**, the CS received a text

10  message from GUTIERREZ-PONCE (562-618-3863) which read, "I'm headed over there

11  dude, it's just that I didn't have them counted out."  Approximately 30 seconds later,

12  TFO Chohrach observed **Target Vehicle 1** depart the parking lot of **Target Residence 2.**

13      89.    At 4:39 p.m., TFO Earick observed **Target Vehicle 1** enter the parking lot

14  of the Southcenter Mall, driving toward the Buffalo Wild Wings.  TFO Nisco observed

15  **Target Vehicle 1** park next to the CS's vehicle on the passenger side.  SA Gibb observed

16  GUTIERREZ-PONCE exit the driver's seat of **Target Vehicle 1** and enter the front

17  passenger seat of the CS's vehicle.  SA Gibb then heard (via the recording/transmitting

18  device) the CS conduct a drug transaction with the CS.

19      90.    At 4:42 p.m., SA Gibb observed GUTIERREZ-PONCE exit the CS's

20  vehicle, enter the driver's seat of **Target Vehicle 1**, and drive out of the parking lot.

21  Surveillance was maintained on **Target Vehicle 1**, as it traveled north on I-5 and then

22  north SR-599.  Shortly thereafter, agents observed **Target Vehicle 1** accelerating rapidly

23  and making several abrupt lane changes, at which point surveillance was terminated.

24  TFO Chohrach maintained surveillance at **Target Residence 2** but did not observe

25  GUTIERREZ-PONCE return to that location.

26      91.    Meanwhile, SA Gibb and your Affiant maintained constant surveillance on

27  the CS and met him/her at a predetermined location.  The CS provided agents a clear

28

AFFIDAVIT OF SA ERIC RODENBERG – 23
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  plastic bag containing blue pills marked "M-30."  Agents searched the CS and the CS's
2  vehicle for contraband, with none found.

3      92.    Agents then interviewed the CS regarding the controlled purchase.  The CS
4  stated that shortly after s/he arrived at the Buffalo Wild Wings, s/he observed
5  GUTIERREZ-PONCE arrive driving a blue pickup truck.  GUTIERREZ-PONCE then
6  entered the CS's vehicle and handed the CS the plastic bag containing the blue pills.  The
7  CS handed GUTIERREZ-PONCE the $2,500 of OAF and watched as he counted it.
8  GUTIERREZ-PONCE stated that he has brought 290 pills.  The CS stated that he had
9  asked for 270, but GUTIERREZ-PONCE was not concerned.

10                **TACTICS USED BY DRUG TRAFFICKERS**

11      93.    Based upon my training, experience, and participation in this and other
12  investigations involving drug trafficking, my conversations with other experienced
13  investigators and law enforcement investigators with whom I work, and interviews of
14  individuals who have been involved in the trafficking of methamphetamine, heroin,
15  cocaine and other drugs, I have learned and know the following:

16      94.    Drug traffickers often use "stash houses" to conceal their illegal activities
17  and contraband.  Such stash houses allow drug traffickers to keep their contraband at a
18  hidden location, where they may not live, thereby making it more difficult for law
19  enforcement and/or competitors to identify these locations where drugs and drug
20  proceeds may be hidden.

21      95.    It is common for drug traffickers to hide proceeds of illegal drug sales and
22  records of illegal drug transactions in secure locations within their residences, stash
23  houses, storage units, garages, outbuildings and/or vehicles on the property for their
24  ready access and to conceal them from law enforcement authorities.

25      96.    It is common to find papers, letters, billings, documents, and other writings,
26  which show ownership, dominion, and control of businesses, residences, and/or vehicles
27  in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of
28  drug traffickers.  Items of personal property that tend to identify the persons in residence,

AFFIDAVIT OF SA ERIC RODENBERG – 24
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    occupancy, control, or ownership of the premises also include canceled mail, deeds,

2    leases, rental agreements, photographs, personal telephone books, diaries, utility and

3    telephone bills, statements, identification documents, keys, financial papers, rental

4    receipts and property ownership papers, personal and business telephone and address

5    books and telephone toll records, and other personal papers or identification cards in the

6    names of subjects involved in the criminal activity being investigated.

7         97.    Drug traffickers frequently amass large amounts of proceeds, in the form of

8    cash, from the illegal sale of drugs that they attempt to legitimize or "launder." To

9    accomplish this goal, drug traffickers use financial institutions and their attendant

10   services, securities, cashier's checks, safe deposit boxes, money drafts, real estate, shell

11   operations, and business fronts. Persons involved in drug trafficking and/or money

12   laundering keep papers relating to these activities for future reference, including federal

13   and state tax records, loan records, mortgages, deeds, titles, certificates of ownership,

14   records regarding investments and securities, safe deposit box rental records and keys,

15   and photographs. I know from my training and experience that often items of value are

16   concealed by persons involved in large-scale drug trafficking inside of safes, lock boxes,

17   and other secure locations within their residences, outbuildings, and vehicles.

18        98.    Drug traffickers often place assets in names other than their own to avoid

19   detection by investigative/police agencies, and even though these assets are in the names

20   of other individuals or businesses, the drug traffickers actually own and continue to use

21   these assets and exercise dominion and control over them.

22        99.    Drug traffickers often document aspects of their criminal conduct through

23   photographs or videos of themselves, their associates, their property, and their products,

24   including drugs and drug proceeds. Drug traffickers usually maintain these photographs

25   or videos in their possession.

26        100.    Drug traffickers often maintain large amounts of U.S. currency in order to

27   maintain and finance their ongoing illegal drug trafficking business. Often, drug

28

AFFIDAVIT OF SA ERIC RODENBERG – 25
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  traffickers from other countries operating in the United States use wire remitters and bulk

2  cash transfers to transfer currency to co-conspirators living in other states or countries.

3    101.   Drug traffickers commonly have in their possession, on their person, and at

4  their residences and/or in their storage units, firearms and other weapons, which are used

5  to protect and secure their property.

6    102.   Drug traffickers use mobile electronic devices including cellular telephones

7  and other wireless communication devices to conduct their illegal activities.  For

8  example, traffickers of controlled substances commonly maintain records of addresses,

9  vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone

10  numbers of their suppliers, customers and associates in the trafficking organization.  It is

11  common to find drug traffickers keeping such records of said associates in cellular

12  telephones and other electronic devices.  Drug traffickers frequently change their cellular

13  telephone numbers to avoid detection by law enforcement, and it is common for drug

14  traffickers to use more than one cellular telephone at any one time.

15    103.   Drug traffickers use cellular telephones to maintain contact with their

16  suppliers, distributors, and customers.  They prefer cellular telephones because, first, they

17  can be purchased without the location and personal information that landlines require.

18  Second, they can be easily carried to permit the user maximum flexibility in meeting

19  associates, avoiding police surveillance, and traveling to obtain or distribute drugs.

20  Third, they can be passed between members of a drug conspiracy to allow substitution

21  when one member leaves the area temporarily.  Since the use of cellular telephones

22  became widespread, every drug trafficker with which I have interacted has used one or

23  more cellular telephones for his or her drug business.  I also know that it is common for

24  drug traffickers to retain in their possession cellular phones that they previously used, but

25  have deactivated or discontinued using.  Based on my training and experience, the data

26  maintained in a cellular telephone used by a drug trafficker is often evidence of a crime

27  or crimes.  This includes the following:

28

AFFIDAVIT OF SA ERIC RODENBERG – 26
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          a.  The assigned number to the cellular telephone (known as the mobile

2    directory number or MDN), and the identifying telephone serial number (Electronic

3    Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile

4    Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are

5    important evidence because they reveal the service provider, allow us to obtain subscriber

6    information, and uniquely identify the telephone. This information can be used to obtain

7    toll records, to identify contacts by this telephone with other cellular telephones used by

8    co-conspirators, to identify other telephones used by the same subscriber or purchased as

9    part of a package, and to confirm if the telephone was contacted by a cooperating source.

10          b.  The stored list of recent received calls and sent calls is important evidence.

11    It identifies telephones recently in contact with the telephone user.  This is valuable

12    information in a drug investigation because it will identify telephones used by other

13    members of the organization, such as suppliers, distributors and customers, and it

14    confirms the date and time of contacts.  If the user is under surveillance, it identifies what

15    number he called during or around the time of a drug transaction or surveilled meeting.

16    Even if a contact involves a telephone user not part of the conspiracy, the information is

17    helpful (and thus is evidence) because it leads to friends and associates of the user who

18    can identify the user, help locate the user, and provide information about the user.

19    Identifying a defendant's law-abiding friends is often just as useful as identifying his

20    drug-trafficking associates.

21          c.  Stored text messages are important evidence, similar to stored numbers.

22    Agents can identify both drug associates, and friends of the user who likely have helpful

23    information about the user, his location, and his activities.

24          d.  Photographs on a cellular telephone are evidence because they help identify

25    the user, either through his or her own picture, or through pictures of friends, family, and

26    associates that can identify the user.  Pictures also identify associates likely to be

27    members of the drug trafficking organization.  Some drug traffickers photograph groups

28    of associates, sometimes posing with weapons and showing identifiable gang signs.

AFFIDAVIT OF SA ERIC RODENBERG – 27
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Also, digital photos often have embedded "geocode" information within them.  Geocode

2    information is typically the longitude and latitude where the photo was taken.  Showing

3    where the photo was taken can have evidentiary value.  This location information is

4    helpful because, for example, it can show where coconspirators meet, where they travel,

5    and where assets might be located

6           e.    Stored address records are important evidence because they show the user's

7    close associates and family members, and they contain names and nicknames connected

8    to phone numbers that can be used to identify suspects.

9           104.    It is common for drug traffickers to possess drugs, drug paraphernalia, and

10   other items which are associated with the sale and use of controlled substances such as

11   scales, containers, cutting agents, and packaging materials in their residences, stash

12   houses, storage units, garages, outbuildings and/or vehicles on their property.

13          105.    Drug traffickers frequently try to conceal their identities by using

14   fraudulent names and identification cards.  Once identities have been created or stolen

15   from other citizens, drug traffickers use those identifications to falsify records such as

16   Department of Licensing records and phone records for the purpose of theft of services

17   and to evade detection by law enforcement.

18          106.    It is a common practice for drug traffickers to maintain records relating to

19   their drug trafficking activities in their residences, stash houses, storage units, garages,

20   outbuildings and/or vehicles.  Because drug traffickers in many instances will "front"

21   (that is, sell on consignment) controlled substances to their associates, or alternatively,

22   will be "fronted" these items from their suppliers, such record keeping is necessary to

23   keep track of amounts paid and owed, and such records will also be maintained close at

24   hand so as to readily ascertain current balances.  These records include "pay and owe"

25   records to show balances due for drugs sold in the past (pay) and for payments expected

26   (owe) as to the trafficker's suppliers and distributors, telephone and address listings of

27   clients and suppliers, and records of drug proceeds.  These records are commonly kept for

28   an extended period.

AFFIDAVIT OF SA ERIC RODENBERG – 28
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    107.    Drug traffickers often maintain books, records, receipts, notes, ledgers,

2    airline tickets, money orders, and other papers relating to the transportation and

3    distribution of controlled substances.  These documents whether in physical or electronic

4    form, are maintained where the traffickers have ready access to them.  These documents

5    include travel records, receipts, airline tickets, auto rental agreements, invoices, and other

6    memorandum disclosing acquisition of assets and personal or business expenses.  I also

7    know that such records are frequently maintained in drugs traffickers' residences, stash

8    houses, storage units, garages, outbuildings and/or vehicles.

9    **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

10    108.    As described in Attachment B, this application seeks permission to search

11    for and seize items listed in Attachment B that might be found in **Target Residence 1**,

12    **Target Residence 2**, or **Target Vehicle 1**, in whatever form they are found.  One form in

13    which evidence, fruits, or instrumentalities might be found is data stored on a computer's

14    hard drive or other digital device[4] or electronic storage media.[5]  Thus, the warrant applied

15    for would authorize the seizure of electronic storage media—specifically, cellular

16    phones—or, potentially, the copying of electronically stored information, all under Rule

17    41(e)(2)(B).

18    109.    Through my training and experience, and the information learned during

19    the course of this investigation, I know that individuals who engage in offenses like those

20

21    _____

22    [4] "Digital device" includes any device capable of processing and/or storing data in electronic
form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet

23    computers, computer servers, peripheral input/output devices such as keyboards, printers,
scanners, plotters, monitors, and drives intended for removable media, related communications

24    devices such as modems, routers and switches, and electronic/digital security devices, wireless

25    communication devices such as mobile or cellular telephones and telephone paging devices,
personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming

26    devices, global positioning satellite devices (GPS), or portable media players.

27    [5] Electronic Storage media is any physical object upon which electronically stored information
can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs,

28    and other magnetic or optical media.

1  described above often keep physical evidence, fruits, and instrumentalities of their crimes

2  inside their residences, including but not limited to, digital devices for storing lists of

3  customers, ledgers of financial transactions, access devices relating to financial accounts

4  (including credit and debit cards), detailed financial records, and cash proceeds. This is

5  particularly true because, for example, GUTIERREZ-PONCE has been surveilled

6  travelling from and/or returning to **Target Residence 1** shortly before or after completing

7  a portion of the controlled purchases described above. Additionally, GUTIERREZ-

8  PONCE has been surveilled traveling to and from VEGA-FLORES's residence (**Target**

9  **Residence 2**) shortly before completing a controlled purchase.

10     110.   I have also learned through training, education, and experience that such

11  evidence, fruits, and instrumentalities are often stored in locked containers, safes, secret

12  compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls,

13  and in other places intended to avoid detection by other people, including law

14  enforcement.

15     111.   Finally, I know that the commission of the offenses detailed herein

16  necessarily requires the use of computers, smart phones, tablets, or other computer

17  devices and storage media for the perpetrator to connect with customers and co-

18  conspirators. I have learned through training and experience that individuals who engage

19  in the offenses described herein also commonly use such electronic devices to keep track

20  of customers, keep records of illegal transactions and criminal proceeds, and store copies

21  of online chats, emails, and other data. In such cases, I know that perpetrators often keep

22  such electronic devices inside their homes. In the case of smart phones, tablets, and

23  laptop computers, perpetrators may also keep such devices on their person, either in their

24  pockets or in containers such as carrying bags, cases, backpacks or protective sleeves.

25     112.   *Probable cause.*  Based upon my review of the evidence gathered in this

26  investigation, my review of data and records, information received from other agents and

27  computer forensic examiners, and my training and experience, I submit that if a digital

28  device or other electronic storage medium is found in **Target Residence 1**, **Target**

AFFIDAVIT OF SA ERIC RODENBERG – 30
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Residence 2**, or **Target Vehicle 1** there is probable cause to believe that evidence, fruits, and instrumentalities of conspiracy to commit drug trafficking, in violation of 21 U.S.C. §§ 841 and 846, will be stored on those digital devices or other electronic storage media, for at least the following reasons:

   a.  I believe that digital devices or other electronic storage media—specifically, cell phones—were being used to communicate with members of, and in furtherance of, the drug trafficking activities described herein. For example, as described above, evidence gathered during the course of the investigation indicates that GUTIERREZ-PONCE and VEGA-FLORES have used cell phones to send and receive communications reflecting, or otherwise related to, the possession and/or distribution of controlled substances.

  113.  There is, therefore, probable cause to believe that evidence, fruits, and instrumentalities, of the crimes under investigation exist and will be found on digital devices or other electronic storage media at **Target Residence 1**, **Target Residence 2**, or **Target Vehicle 1**, for at least the following reasons:

   a.  Based my knowledge, training, and experience, I know that computer files or remnants of such files may be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, this information can sometimes be recovered months or years later with forensics tools. This is because when a person "deletes" a file on a computer, the data contained in the files does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in "swap" or "recovery" files.

   c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what is has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations,

AFFIDAVIT OF SA ERIC RODENBERG – 31
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

artifacts from operating system or application operation, file system data structures, and virtual memory "swap" paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      Digital storage devices may also be large in capacity, but small in physical size. Because those who are in possession of such devices also tend to keep them on their persons, especially when they may contain evidence of a crime. Digital storage devices may be smaller than a postal stamp in size, and thus they may easily be hidden in a person's pocket.

114.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on digital devices found in **Target Residence 1**, **Target Residence 2**, and **Target Vehicle 1** because:

a.      Data on the digital storage medium or digital devices can provide evidence of a file that was once on the digital storage medium or digital devices but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to further establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a

AFFIDAVIT OF SA ERIC RODENBERG – 32
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

computer or storage media (e.g. registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search of "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer activity associated with user accounts and electronic storage media that connected with the computer. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit the crime (e.g. Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

       c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper content, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

AFFIDAVIT OF SA ERIC RODENBERG – 33
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   information necessary to understand other evidence also falls within the scope of the
2   warrant.

3          e.      Further, in finding evidence of how a computer was used, the
    purpose of its use, who used it, and when, sometimes it is necessary to establish that a
4   particular thing is not present on a storage medium.  For example, the presence or
5   absence of counter-forensic programs or anti-virus programs (and associated data) may
6   be relevant to establishing a user's intent.

7          f.      I know that when an individual uses a computer to conduct
    cryptocurrency transactions, the individual's computer or digital device will generally
8   serve both as an instrumentality for committing the crime, and also as a storage medium
9   for evidence of the crime.  The computer or digital device is an instrumentality of the
    crime because it is used as a means of committing the criminal offense.  The computer or
10  digital device is also likely to be a storage medium for evidence of crime.  From my
11  training and experience, I believe that a computer or digital device used to commit a
    crime of this type may contain: data that is evidence of how the computer was used; data
12  that was sent or received; notes as to how the criminal conduct was achieved; records of
13  text discussions about the crime; and other records that indicate the nature of the offense.

14         115.    *Necessity of seizing or copying entire computers or storage medium.*  In
15  most cases, a thorough search of a premises for information that might be stored on
16  digital storage media or other digital devices often requires the seizure of the digital
17  devices and digital storage media for later off-site review consistent with the warrant.  In
18  lieu of removing storage media from the premises, it is sometimes possible to make an
19  image copy of storage media.  Generally speaking, imaging is the taking of a complete
20  electronic copy of the digital media's data, including all hidden sectors and deleted files.
21  Either seizure or imaging is often necessary to ensure the accuracy and completeness of
22  data recorded on the storage media, and to prevent the loss of the data either from
23  accidental or intentional destruction.  This is true because of the following:

24         a.      *The time required for an examination.*  As noted above, not all
25  evidence takes the form of documents and files that can be easily viewed on site.
26  Analyzing evidence of how a computer has been used, what it has been used for, and who
    has used it requires considerable time, and taking that much time on premises could be
27  unreasonable.  As explained above, because the warrant calls for forensic electronic
28  evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage

AFFIDAVIT OF SA ERIC RODENBERG – 34
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.   *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

   c.   *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

   116.   Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all the necessary technical manuals and specialized equipment necessary to consult with computer personnel who have expertise in the type of computer, operating system, or software application being searched.

   117.   The analysis of computer systems and storage media often relies on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively named, erased, compressed, encrypted or password-protected data, while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment such as a laboratory, is typically required to conduct such an analysis properly.

   118.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impracticable to search for data during the execution of the physical search of the premises. The hard drives commonly included in desktop and laptop computers are capable of storing millions of pages of text.

AFFIDAVIT OF SA ERIC RODENBERG – 35
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

119.   A search of digital devices for evidence described in Attachment B may require a range of data analysis techniques.  In some cases, agents may recover evidence with carefully targeted searches to locate evidence without requirement of a manual search through unrelated materials that may be commingled with criminal evidence. Agents may be able to execute a "keyword" search that searches through the files stored in a digital device for special terms that appear only in the materials covered by the warrant.  Or, agents may be able to locate the materials covered by looking for a particular directory or name.  However, in other cases, such techniques may not yield the evidence described in the warrant.  Individuals may mislabel or hide files and directories; encode communications to avoid using keywords; attempt to delete files to evade detection; or take other steps designed to hide information from law enforcement searches for information.

120.   The search procedure of any digital device seized may include the following on-site techniques to seize the evidence authorized in Attachment B:

a.   On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or co-conspirators.

b.   On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when and may contain information about encryption, virtual machines, or stenography which will be lost if the computer is powered down.

c.   On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted in order to preserve unencrypted data that may, if not immediately imaged on-scene become encrypted and accordingly become unavailable for any examination.

121.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information

AFFIDAVIT OF SA ERIC RODENBERG – 36
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  consistent with the warrant.  The later review may require techniques, including but not

2  limited to computer-assisted scans of the entire medium, that might expose many parts of

3  a hard drive to human inspection in order to determine whether it is evidence described

4  by the warrant.

5      122.    GUTIERREZ-PONCE is believed to share **Target Residence 1** with an

6  unidentified female ("UF1") and an unidentified child.  VEGA-FLORES is believed to

7  share **Target Residence 2** with an unidentified female ("UF2") and up to three

8  unidentified children.  And **Target Vehicle 1** is believed to be used by UF2.  As a result,

9  it is possible that **Target Residence 1**, **Target Residence 2**, and **Target Vehicle 1** will

10  contain cell phones that are predominantly used, and perhaps owned, by UF1, UF2 and/or

11  any of the unidentified children.  If it is nonetheless determined that that it is possible that

12  the things described in this warrant could be found on any of those cell phones, the

13  warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

15      123.    Based on the foregoing, I submit that probable cause exists to search

16  **Target Residence 1** and **2** as well as **Target Vehicle 1** for evidence, fruits, and

17  instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and

18  846.

19      124.    This affidavit and the requested warrant are being presented by reliable

20  electronic means, pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

21  ///

22  ///

23  ///

AFFIDAVIT OF SA ERIC RODENBERG – 37
USAO #2020R00153

1    125.    This Court has jurisdiction to issue the requested warrant because it is "a

2    court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a),

3    (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . .

4    that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

5

6                                    DATED February 14, 2020.

7

8

9                          _____

10                         ERIC RODENBERG

11                         Special Agent
                           Drug Enforcement Administration

12

13        The above-named agent provided a sworn statement attesting to the truth of the

     contents of the foregoing affidavit on this 14th day of February, 2020.

14

15                         _____

16                         Hon. MARY ALICE THEILER

17                         United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA ERIC RODENBERG – 38
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A-1

### Location to be Searched

9053 3rd Ave S, Seattle, Washington **(Target Residence 1)**

This location is a two-story, single-family residence located in Seattle, Washington, on a parcel identified through the King County Assessor's Office as Parcel #0013001595. The home is of wood construction and painted a light tan color, with an outside entrance to the basement on the front side of the house. The residence number "9053" is posted in contrasting colors at the bottom of the bay window on the front side of the residence. There is a detached garage on the back side of the residence.

The search is to include all rooms within the residence, and any garages or storage rooms, attached or detached, and any vehicles found within the curtilage of the residence, whether or not particularly named among the vehicles for which specific search authorization is sought.

And any cellular phones found therein.



ATTACHMENT A-1    -1-
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A-2

### Location to be Searched

453 SW 154 St #305, Burien, Washington (**Target Residence 2**)

This location is an apartment unit located in the Jonhil Apartment complex in Burien, Washington.  The complex is one building containing 12 separate apartment units.  The door to Target Residence 2 is in the far southeast corner of the complex, on the second level, and has a tan colored door.  The apartment number "305" is posted on the front door in contrasting colors.

The search is to include all rooms within the residence, and any assigned garages or storage rooms, attached or detached, and any vehicles found within an assigned garage or in any assigned parking space, whether or not particularly named among the vehicles for which specific search authorization is sought.

And any cellular phones found therein.

ATTACHMENT A-2     -1-
USAO #2020R00153

## ATTACHMENT A-3

### Vehicle to be Searched

One blue Mazda B4000 pickup truck bearing Washington license plate C80981M, registered to Julian GUTIERREZ PONCE at 9053 3rd Ave S, Seattle, Washington (**Target Vehicle 1**).

And any cellular phones found therein.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

## Items to be Seized

Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution and possession with intent to distribute controlled substances, and conspiracy to commit these offenses) and occurring in or after January 2019, as follows:

1) Any suspected controlled substances, including, for example, methamphetamine and heroin;

2) Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

3) Drug Transaction Records: Documents such as ledgers, receipts, notes, invoices, and similar items relating to the acquisition, transportation, and distribution of controlled substances;

4) Customer and Supplier Information: Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items;

5) Books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances and communications between members of the conspiracy;

6) Photographs, video tapes, digital cameras, and similar items depicting friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances, and assets derived from the distribution of controlled substances;

7) Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and receipts, bank account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

8) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises and/or vehicle, including

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

9)     Identification documents, including passports, visas, alien registration cards, any travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

10)     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rental car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

11)     Safes and locked storage containers, and the contents thereof that are otherwise described in this document;

12)     Latent prints and identifying material from items at the residences and vehicles;

13)     Stored footage from surveillance systems at the locations to be searched which identifies the person(s) in residence, occupancy, control, or ownership of the premises, and suspected buyers or sellers of controlled substances;

14)     Documents and other items tending to show the existence of other stored controlled substances, including rental agreements, receipts, keys, notes, and maps specially concerning off-site storage rooms and/or lockers;

15)     Weapons and other dangerous items, to include rifles, shotguns, knives, and handguns, as well as ammunition, shell casings, bullets, magazines, cleaning equipment, holsters, gun boxes and cases, trigger locks, gun safes, gun parts and tools, targets, receipts, bills of sale, and body armor;

16)     Address books, daily logs, daily telephone diaries, calendars, and appointment books;

17)     United States currency, gift cards, cash cards, and records relating to income derived from, or used or intended to be used to facilitate, buying, selling, and/or distributing controlled substances, and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, checkbooks, check registers, securities, precious metals, jewelry, automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of the aforementioned crimes of investigation;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

18)    Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

    a.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

    b.    Stored list of recent received, sent, and missed calls;

    c.    Stored contact information;

    d.    Stored photographs of controlled substances, currency, firearms or other weapons, controlled substances cultivation, packaging, and/or paraphernalia, evidence of suspected criminal activity, including photographs of documents or other items described above, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs; and

    e.    Stored text messages.

THE SEIZURE OF CELL PHONES AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH CELL PHONES CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES.

ATTACHMENT B    -3-
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970